**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BENJAMIN ANTHONY ADAMS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 5:26-cv-03600 |
| | : | |
| ST. LUKE'S UNIVERSITY HEALTH | : | |
| NETWORK, *et al.,* | : | |
| Defendants. | : | |

### MEMORANDUM

**Joseph F. Leeson, Jr.**                                                    **July 13, 2026**
**United States District Judge**


Benjamin Anthony Adams filed this *pro se* civil action against St. Luke's University Health Network ("St. Luke's"), the Allentown Police Department, and the City of Allentown,[1] alleging that the hospital discharged him from the emergency room without first stabilizing him and that Allentown police officers interfered with his attempts to be transported to another hospital for care and falsely arrested him. Adams asserts claims under Title 42 U.S.C. § 1983 and the Emergency Medical Treatment and Labor Act ("EMTALA"). He also seeks leave to proceed *in forma pauperis*. For the following reasons, the Court will grant Adams leave to proceed *in forma pauperis* and dismiss his Complaint.

---

[1]     Although Adams expressly names "Allentown City Hall" as the Defendant, the Court construes this as naming the City of Allentown.

## I.    FACTUAL ALLEGATIONS[2]

Adams was transported by ambulance to the emergency room at St. Luke's on April 3, 2026.  *See* Compl. at 4.  He had been having "stomac[] issues" and was "unable to walk" or to "flush [his] system."  *Id*.  In the ambulance, his blood sugar reading was 328, and at the emergency room, it had risen to 348.  *See id*.  Despite these readings, the emergency room staff did not provide Adams with "IV insulin metformin" or any other medication "to stabilize" Adams's blood sugar level.  *Id*.  Instead, emergency room staff gave him pain medication and a "sugar liquid laxative" and "completely ignore[ed]" his sugar level and history of diabetes.  *Id*.

At some point, Adams was discharged from St. Luke's even though he was still "in severe pain" and "unable to walk."  *Id*.  When he was discharged, he was given paperwork that left blank his blood sugar level.  *See id*.  Adams alleges that St. Luke's did not treat or stabilize him but instead "patient dump[ed]" him by discharging him.  *Id*.  After exiting the hospital, Adams called 911 to be transported to another hospital by ambulance.  *See id*.  In response to his 911 call, approximately seven Allentown police officers met Adams at St. Luke's Hospital.  *See id*.  Police Officer Cruz told Adams that the officers were "not a cab taxi service or a [c]rutch to use to be transported to another hospital" and that, if he tried to call 911 again, he would be charged with "misuse of a 911 emergency call."  *Id*. at 7.  The officers laughed at Adams.  *See id*.  Adams ignored Officer Cruz and called 911 anyway, but Officer Cruz instructed the 911 dispatcher to disregard Adams's call.  *See id*.  A sergeant then arrived, who was "very dismissive" and threatened to charge Adams with misuse of an emergency call.  *Id*.  The sergeant escorted Adams "up the outside ER driveway" while "slightly pushing him."  *Id*. at 8.  As they

---

[2]    The factual allegations set forth in this Memorandum are taken from Adams's Complaint. *See* Compl., ECF No. 2.  The Court adopts the sequential pagination assigned to the Complaint by the CM/ECF docketing system.

passed a police captain, Adams asked the captain for help. *See id*. The captain cursed at Adams and threatened to place him in handcuffs. *See id*. Adams then responded that he would call the 911 dispatcher from the sidewalk. *See id*. The sergeant said "OK" and then arrested and detained Adams and charged him with simple trespassing and criminal trespassing. *Id*. He claims he was not given *Miranda* warnings and "sat in jail" for an unstated period of time. *Id*. When the police officers and St. Luke's failed to appear for a hearing on May 19, 2026, the criminal charges were dismissed. *See id*.; *see also* ECF No. 7 (state court docket sheet indicating that the charges were dismissed).

Based on these allegations, Adams asserts constitutional claims pursuant to § 1983 and EMTALA claims. *See id*. at 3. He names as Defendants St. Luke's, the City of Allentown, and the Allentown Police Department. *See id*. He alleges that he suffered "severe [e]motional and mental stress or [d]uress." *Id.* at 5. For relief, he seeks $5 million from each defendant. *See id*. at 5.

## II.   STANDARD OF REVIEW

Since it appears that Adams is incapable of paying the fees to commence this civil action, the Court will grant him leave to proceed *in forma pauperis*. Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). At this early stage of the litigation, the Court will accept the facts alleged

in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether the complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678. Because Adams is proceeding *pro se*, the Court construes his allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013)).

## III.    DISCUSSION

### A.    EMTALA Claim

Adams asserts an EMTALA claim against St. Luke's, alleging that the hospital failed to stabilize him before discharging him. EMTALA requires hospitals to provide emergency patients with "an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). If during screening, an emergency medical condition is discovered, the hospital must either provide stabilizing treatment or transfer the patient to another hospital that can provide such treatment. *See id*. at § 1395dd(b)(1); *see also Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 172 (3d Cir. 2009) ("EMTALA requires hospitals to give certain types of medical care to individuals presented for emergency treatment: (a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities."). "The purpose of EMTALA is to prevent 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions [are] stabilized." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999) (citations omitted); *see also Torretti*, 580 F.3d

at 173 ("Congress enacted EMTALA in the mid–1980s based on concerns that, due to economic constraints, hospitals either were refusing to treat certain emergency room patients or transferring them to other institutions.") (citation omitted); *Duffus v. MaineHealth*, 791 F. Supp. 3d 61, 71 (D. Me. 2025) (explaining legislative purpose of EMTALA to address concerns that "some hospitals were refusing to treat poor, uninsured patients, including people who were critically ill and women in labor").  While the statute was not intended to replace state law malpractice claims, *see Torretti*, 580 F.3d at 173 ("[EMTALA] does not create a federal cause of action for malpractice"), it allows an individual to sue a hospital for failing to provide appropriate emergency screening or failing to stabilize an emergency medical condition, so long as that individual suffers "personal harm as a direct result" of the hospital's failure.  42 U.S.C. § 1395dd(d)(2)(A).

Based on the facts alleged in the Complaint, the Court understands Adams to assert a "failure to stabilize claim" under EMTALA.  To allege a plausible failure to stabilize claim, a plaintiff must allege facts showing that he "(1) had an emergency medical condition; (2) the hospital actually knew of that condition; and (3) the [plaintiff] was not stabilized before being transferred."[3]  *Toretti*, 580 F.3d at 178.  EMTALA defines "to stabilize" as "to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer [or discharge] of the individual."  42 U.S.C. § 1395dd(e)(3)(A).

Adams does not allege sufficient facts from which the Court can plausibly infer that St.

---

[3]    The word "transfer" as used in the statute includes "discharge."  42 U.S.C. § 1395dd(e)(4) ("The term 'transfer' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital.").

Luke's failed to stabilize him prior to discharging him. Initially, the Court notes that the Adams does not clearly specify which emergency medical condition he is citing as the basis for his EMTALA claim—high blood sugar, stomach pain, or another issue. He states that he was transported to St. Luke's for "stomach issues" and an inability to walk and to "flush" his "system." Compl. at 4. He was discharged despite still experiencing pain and being unable to walk. *Id.* While he alleges that emergency room staff did not properly treat or stabilize his high blood sugar level, he does not assert facts from which one could infer that this was an emergency medical condition. Moreover, besides the conclusory allegation that the hospital failed to "stabilize" him, Adams offers no factual support about the emergency room staff's awareness of his emergency medical condition, the treatment or lack of treatment he received for that condition, including what the treatment entailed and how long it lasted, and how that treatment failed to stabilize his emergency medical condition. This is insufficient to state a plausible claim. *See Iqbal*, 556 U.S. at 678 (stating that "an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" or "a pleading that offers labels and conclusions," or "formulaic recitation[s] of the elements of a cause of action will not do") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also MacNeill v. Jayaseelan*, No. 14-242, 2014 WL 12712420, at *3 (N.D. Tex. Oct. 8, 2014) (dismissing an EMTALA failure to stabilize claim where the plaintiff only offered conclusory statements to support the claim).

Additionally, Adams has not alleged that he suffered the requisite "personal harm" to state a plausible EMTALA claim. 42 U.S.C. § 1395dd(d)(2)(A) ("Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable

6
071326

relief as is appropriate."). Adams alleges vaguely that, due to the "mental and emotional trauma" of being discharged from St. Luke's, he has been too "scared" to seek further treatment and thus "do[es] not know at this juncture" what injuries he has sustained. Compl. at 5. Without more facts, Adams's allegations are insufficient to show that Adams suffered the personal harm necessary to state an EMTALA claim. *See, e.g.*, *Jefferson v. Burton*, No. 19-1390, 2020 WL 7075100, at *4 (M.D. Pa. Aug. 10, 2020) (dismissing an EMTALA claim where the plaintiff's "vague claim that his mental health conditions were exacerbated" was "insufficient to state an EMTALA claim . . . as to the physical harm suffered by [the p]laintiff after [the hospital] turned him away"), *report and recommendation adopted*, No. 19-1390, 2020 WL 6375617 (M.D. Pa. Oct. 30, 2020). Accordingly, Adams has failed to state a plausible failure to stabilize claim under EMTALA.[4]

### B.    Section 1983 Claims

Adams asserts constitutional claims against Defendants based on their "obstructing" his efforts to call 911 after his discharge from St. Luke's, Compl. at 5, and based on his "false arrest" on simple and criminal trespassing charges. *See id*. at 5. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under [Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations

---

[4]    To the extent that Adams also intended to assert a failure to screen claim against St. Luke's, his conclusory allegations similarly fail to support a plausible claim. *See McClure v. Parvis*, 294 F. Supp. 3d 318, 325 (E.D. Pa. 2018) ("[T]o state an EMTALA failure-to-screen claim, the plaintiff must allege that: (1) the patient had an emergency medical condition; and (2) the hospital did not screen the patient in the same way it screens other patients presenting with similar symptoms.").

omitted).

### 1.    Section 1983 Claims against Allentown Police Department and the City of Allentown

Any Section 1983 claims Adams asserts against the Allentown Police Department must

be dismissed with prejudice because a police department is not a proper defendant under §

1983.[5]  *See Martin v. Red Lion Police Dep't*, 146 F. App'x. 558, 562 n.3 (3d Cir. 2005) (*per*

---

[5]     Even if Adams had named an individual police officer defendant, his Section 1983 claims would nevertheless fail, as pleaded.  To the extent Adams alleges a claim that the police officers were deliberately indifferent to his serious medical need, he has not alleged sufficient facts from which the Court could infer that any individual officer acted with deliberate indifference and that their actions caused Adams to suffer harm.  *See DeJesus v. Delaware through Delaware Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) ("A plaintiff who alleges defendants were deliberately indifferent to his serious medical need must show that (1) he had a serious medical need, (2) defendants were deliberately indifferent to that need, and (3) the deliberate indifference caused harm or physical injury to the plaintiff.") (citation omitted).

To the extent Adams intended to assert a Fourteenth Amendment claim against the police officers under a state-created danger theory, he has not alleged that he suffered any physical harm, but only emotional harm, which is insufficient to state a state-created danger claim.  *See Johnson v. City of Phila.*, 975 F.3d 394, 400 (3d Cir. 2020) (holding that to plead a plausible claim based on a "state created danger" theory a plaintiff must allege "first, foreseeable and fairly direct harm; second, action marked by 'a degree of culpability that shocks the conscience'; third, a relationship with the state making the plaintiff a foreseeable victim, rather than a member of the public in general; and fourth, an affirmative use of state authority in a way that created a danger, or made others more vulnerable than had the state not acted at all.") (*citing Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018)); *see also Carey v. City of Wilkes-Barre*, 410 F. App'x 479, 483 (3d Cir. 2011) (concluding that anxiety is not the "foreseeable and fairly direct harm" required to allege a state-created danger claim); *J.B. by & through J.B. v. Greater Latrobe Sch. Dist.*, No. 21-690, 2023 WL 5510365, at *8 (W.D. Pa. Aug. 25, 2023) ("Emotional distress is not a cognizable harm for purposes of setting forth a state-created danger claim").

To the extent that Adams intended to assert Fourth Amendment false arrest or malicious prosecution claims, he has not alleged that the officers lacked probable cause.  *See e.g., Santiago v. Hulmes*, No. 14-7109, 2015 WL 1422627, at *4 (E.D. Pa. Mar. 30, 2015) (dismissing false arrest, false imprisonment, and malicious prosecution claims when plaintiffs failed to "affirmatively assert facts to show that the Officer Defendants did not have probable cause" when the plaintiffs simply alleged that all allegations against them in the underlying criminal proceedings were false); *see also Slack v. McHugh*, No. 24-2153, 2025 WL 2753671, at *2 (3d Cir. Sept. 29, 2025) ("[A] plaintiff must adequately allege a lack of probable cause to avoid a Rule 12(b)(6) dismissal.").

*curiam*) (stating that a police department is not a proper defendant in an action pursuant to Section 1983 because it is a sub-division of its municipality); *see also Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability.") (citing *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 671 n.7 (3d Cir. 1988)); *see also Downes v. Allentown Police Dep't*, No. 25-5805, 2025 WL 3539258, at *3 (E.D. Pa. Dec. 10, 2025) (dismissing Section 1983 claims against the Allentown Police Department).

Moreover, all claims asserted against the City of Allentown must also be dismissed because nothing in the Complaint suggests that Adams's alleged constitutional harm resulted from a City of Allentown policy or custom. *See Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding that, to state a claim for municipal liability, a plaintiff must allege that the government defendant's policy or custom caused the alleged constitutional violation); *Sorrells v. Phila. Police Dep't*, 652 F. App'x 81, 83 (3d Cir. 2016) (*per curiam*) (affirming dismissal of claims and noting that "even construing [the plaintiff's] complaint as against the City of Philadelphia, [the plaintiff] did not plead that any municipal policy, custom, or practice led to the purported constitutional violations at issue, as a viable municipal liability claim requires") (citation omitted). Accordingly, all claims against the City of Allentown will be dismissed.

### 2. Section 1983 claims against St. Luke's

To the extent that Adams also intended to assert Section 1983 claims against St. Luke's, the claims must also be dismissed because Adams has not alleged that St. Luke's is a state actor. "The color of state law element is a threshold issue; there is no liability under [Section] 1983 for those not acting under color of law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir.

1995).  Whether a defendant is acting under color of state law—i.e., whether the defendant is a state actor—depends on "whether there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).  "To answer that question, . . . [the United States Court of Appeals for the Third Circuit has] outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists:  (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotation marks, alteration, and citation omitted); *see also Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) ("[A] private entity may qualify as a state actor when it exercises powers traditionally exclusively reserved to the State.") (internal citations omitted).

Nothing alleged in the Complaint allows the Court to draw the plausible inference that St. Luke's actions may be fairly treated as those of the State under any of the recognized tests.  *See, e.g., Boyd v. Shriners Hosps. for Children*, No. 25-1183, 2026 WL 1005549, at *2 (3d Cir. Apr. 14, 2026) (stating that a private hospital was not a state actor under the public function test, symbiotic relationship test, or state-enforced customs test advanced by the plaintiffs); *Carver v. Plyer*, 115 F. App'x 532, 537 (3d Cir. 2004) (holding that St. Luke's Hospital "is not a state actor for purposes of section 1983 under any of the possible tests used to determine whether one's conduct is attributable to the state" ); *Pinnock v. Univ. of Pa. Hosp.*, No. 25-5276, 2025

WL 2901060, at *3 (E.D. Pa. Oct. 9, 2025) (dismissing Section 1983 claims against a hospital and doctors because plaintiff failed to plausibly plead that they were state actors). Accordingly, any Section 1983 claims that Adams asserts against St. Luke's in connection with its care and discharge of him will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Adams leave to proceed *in forma pauperis* and dismiss his Complaint in part with prejudice and in part without prejudice. Adams's claims against the Allentown Police Department will be dismissed with prejudice. The balance of his claims will be dismissed without prejudice. Adams may file an Amended Complaint if he can cure the defects the Court noted as to his claims dismissed without prejudice.

An Order follows with additional instructions as to amendment.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge